The next matter on our calendar is People of the State of New York and Others versus Kenneth Griep and Others. May it please the Court, Esther Murdykaeva for the Attorney General. Federal, State, and City law have protected safe access to reproductive health care clinics for more than 25 years. The district court's decision in this case renders those protections illusory for patients of the Choices Women's Medical Center. This is a very strong statement, that it renders them illusory. I mean, the district court came out against you, but come on, you know, this is a tough case. Let's try not to exaggerate on either side, okay? I appreciate that, Your Honor. But what the district court's decision does allow is the type of conduct that the defendants engaged in here, which includes running up to patients as they're approaching the clinic, standing in clusters outside of car doors as people are trying to exit, including with small children, approaching patients with their small children, and speaking to the small children directly. Now, I understand that taken analyzing each of those elements separately might lead to a different conclusion, but all of these questions are very context-specific, and all of this behavior occurs in a context in which it occurs together. Kagan, can you point us to the, because I've reviewed a lot of the video evidence, I'm still digesting it, but can you point us to the specific parts of the record that you would have us look at for the proposition that you just offered? Certainly. I can begin with obstruction. But direct the Court's attention first to the pictures at pages 2200 to 2203 and 3950 of the record, and what those pictures show is the number of signs that are used here and the size of the signs and exactly how much space they take up on the sidewalk. Now, this is a narrow 16-foot sidewalk in a New York City street. It is, it has people contained on it, but it also has these multiple 3-by-5-foot signs that defendants are using, often one right behind each other, that take up a lot of space on an already padded sidewalk. Next, I would direct the Court to Exhibits 31 and 41, which are videos, and those videos show the defendants using their signs and bodies and physically moving with their signs and bodies towards patients in a way that redirects patients' path. In several occasions, it directs patients to crowd into narrow spaces, often against a wall, just in order to be able to access the clinic. Exhibit 39 is another, is a car example. That's an example of four defendants standing outside of a car door as a patient and her partner are trying to get out with a child and a stroller. Now, what the district court concluded is that the fact that patients were ultimately able to access the clinic means that obstruction did not occur. But that finding is not consistent with this Court's case law, the decisions in Scott and Operation Rescue National, or the language of the statute. Sotomayor, you mean the fact that they were able to get through these crowd of protesters, push away the signs, push away the literature, but make it to the door means that there was no violation. That's their argument, and you disagree with that? We do disagree with that argument, both because of the text of the statute and this Court's decisions in Scott and Operation Rescue National. But the text of the statute prohibits is conduct that makes passage to or from the facility unreasonably difficult or hazardous. Those terms do not mean, do not only include conduct that actually blocks passage to the door or precludes people from entering. Unreasonably difficult is fairly capacious language, and that is. How much does continuing to press a position after somebody says, I don't want to hear it, violate the statute? That's one of the things which I think is very close in this question of between rights to get your point of view across and the right not to be harassed. And I just would like your view on that question of how much, when somebody says, okay, enough, go away, people still have a right under the First Amendment and under these statutes properly interpreted under the First Amendment to say, I continue to press. Well, Your Honor, just to clarify, I think you're asking about the follow-and-harass provision of the New York City law, which has distinct elements from the obstruction provisions of the three statutes. So with respect to the New York City provision, the follow-and-harass provision, what the defendants are doing here is not just continuing to talk to people. They're following them at extremely close distances, within inches. There is evidence in this record on page JA-2858, and I believe the district court acknowledged it, too, that one of the defendants was walking so close to a patient that she stepped on the patient's shoe and that shoe broke. Now, the problem here is not just the pressing and continuing to press a certain position after a person has indicated that they wish you to stop. It is doing that and the problem with all that is how much are we bound to follow what the district court found in terms of credible statements and so on? Now, the district court excluded certain things altogether as not being representative, and there's a question of whether they were meant to be representative or not, and therefore should be considered. The court said that certain statements were of doubtful credibility. You, in your brief, said that they ignored them altogether. I'm not altogether sure. The court at one point talks about just being doubtfully credible, and that affects the degree of weight. At another point, it does say I didn't give them any weight. So whether these things which you're now describing occurred depends really on how much weight, how much deference we have to give to these courts, to the court's findings on these. So once again, to clarify, I do have a response to that, and I would like to address the evidentiary holdings here. But all of the evidence that I have been referring to so far is the evidence like the videos or the photographs or defendant's own testimony or defendant's own notes that the district court did not make adverse credibility or reliability findings with respect to. So all of the evidence that I have mentioned so far is evidence that the district court considered reliable or credible. And I would like to return to the evidentiary issues, but just to finish answering your prior question, the following and harassing conduct here is not just continuing to speak to people. It is following them very closely, being within their personal space, reaching out and trying to force literature into their hands. What the follow and harass provision prohibits is a scope of conduct. One of the categories of harassment that the statute incorporates from the penal law is a course of conduct or a series of acts that is intended to alarm or annoy an individual. And I think it's indisputed here that this conduct does, in fact, alarm or annoy individuals. There are several instances here that are visible on video or in notes by the defendants. Exhibit 135 is such a video. Exhibit 37 is another video where there have been altercations that have occurred between the defendants and the patient. Roberts. Yeah. But, you know, words like alarm or annoy are very difficult in this context, because there are certain things that people cannot do under the First Amendment that alarm and annoy. They can't threaten them. And we'll have to come back to Weber v.s. Edwards about knives and guns, and you'll get yours, essentially, or essentially transcendental things, or whether they are threats. But there are, you know, when you object to what somebody is doing and make your point, you will always alarm and annoy. I mean, the First Amendment, to some substantial extent, allows you to alarm and annoy something. I mean, a First Amendment right to say you are doing something to someone whom I consider to be a baby alarms and annoys that person. I mean, there's no question about it. And yet that's okay, isn't it? To be perfectly clear, what we are talking about here is the defendant's conduct and not the content of their speech. We're not saying that it is the content of their speech that alarms or annoys people. We are saying it is their conduct, which includes physically being within inches of people.  Kagan. Kagan. I mean, I've spent a good amount of time with the videos, and I'm having difficulty seeing how you so clearly and confidently come to the conclusion that our standard in Operation Rescue has been misapplied. I mean, Operation Rescue, they were slowing or stopping cars' progress, shouting at pedestrians, standing in front of them as they tried to enter the building, blocking clinic doors by points by standing directly in front of them. And the time that I've spent with the videos thus far, I'm not seeing that. I see very quick entry into the clinic from a 15-feet sidewalk, crossing the sidewalk. There are protesters usually outnumbered by escorts who are helping the patients  So what am I missing? And where exactly did the district court go wrong in the factual determinations? So several answers to that. I think Operation Rescue National cites a list of conduct that could constitute obstruction, and some of the conduct includes interfering with pedestrians as they approach the building, shouting at them and standing in front of them, with no indication that there is some sort of de minimis exception. And I think this Court's decision in Scott as well includes a list of conduct that in some ways elaborates on the conduct in Operation Rescue National or vice versa. Actually, I think Scott came first. But we thought we were addressing the constitutionality of a buffer zone, so we weren't specifically addressing obstruction, were we? Well, you were addressing obstruction in the sense that there was, I believe that there was a challenge to the district court's finding of obstruction as well. And what this Court said in Scott is that conduct such as, and this is a quote, stepping in front of escorts, using his sign to prevent escorts from walking past him, positioning himself next to patients' automobiles so that they have difficulty opening their car doors, following patients to and from the entrance, and running at patients and yelling at them constitutes obstruction. And I think we see evidence of all of that type of conduct here. And once again, Scott also does not have the de minimis requirement that the district court seemed to infer. So for example, at page 40 of the district court's decision, the court is analyzing Exhibit 138, and it acknowledges that one of the defendants was standing in front of the patient and the companion, and that the patient and companion had to slightly alter their path to get around him. And what the court found is that there is no obstruction because the patients and companion were able to, quote, walk around, okay, the defendant, and on to the clinic door. But that seems inconsistent with Scott. I think it is also inconsistent with what the statutory definition of unreasonably difficult means. The D.C. Circuit in the Mahoney case made clear that the FACE Act, quote, does not limit physical obstruction to bodily obstruction, but rather is broadly phrased to prohibit any act rendering passage to the facility unreasonably difficult. Sotomayor, I want to ask you about a photograph, Exhibit 119. It's a photograph that shows three signs blocking what, just by looking at it, looks like two-thirds of the sidewalk is blocked. The district court relied heavily on the fact that the photograph did not show any patients approaching the clinic or being blocked at that moment. And my question is, is the fact that no patients were in the photograph or actually obstructed, does that preclude a FACE violation? It does not, Your Honor, and that is true because of this Court's decision in Dugan. Dugan was also an instance where the act of obstruction did not actually block any particular person from entering, because I think this Court actually made a finding that no one tried to enter at that time. But what this Court made clear is that so long as the defendant acted with the requisite intent and the conduct constituted obstruction within the meaning of the FACE Act, that there was a violation here, irrespective of whether any patient was or was not precluded from entering. Let me understand the record. The surveillance by the Attorney General lasted over a year. Am I right about that? I think that's right. And that was every Saturday morning for the entire year? Oh, that was when the protester conduct occurred. Thank you, counsel. You've reserved three minutes for rebuttal. We'll hear from the protesters. Good morning, Your Honors. Martin Cannon. I'm here on behalf of 10 of the 13 defendants, the GRIP defendants. I'm with the Thomas More Society. I do want to comment very briefly. I think I only have six minutes on some things that the State has argued here. They want you to look at the size of the signs and the crowded picture on the sidewalk. But it's very important to appreciate, and the judge in the trial came to appreciate the fact that these pictures are taken down the length of the sidewalk. There's a lot of foreshortening that you can forget about. It's 100 feet long or something, and there's four or five signs. They're altered. It's not really a problem. At the very You're saying the photographs were altered? No, no, no, no. They're not altered. It's just that they show a long sidewalk without any real ability to perceive the length of it. 119, which I just discussed with counsel, does not show a long sidewalk. It shows it's very close to the signs. Yeah. I think if I remember that picture correctly, that was the two signs on the one side and the other side. Which look like takes up two-thirds of the sidewalk, as I look at just eyeballing it. Yeah. It takes up a good part of the sidewalk, but it leaves five feet or so in the middle that is about as wide as a lot of city sidewalks anyway. And very importantly, as to the question about whether you can block somebody who isn't there, all the evidence in this case suggests that if somebody had come down the sidewalk, our people would have stepped aside anyway if it was necessary. But there's an awful lot of evidence from the defendants themselves of what they were trying to do, of tag-teaming, of doing any number of other things which, if we for a moment got out of this particularly hot context, we have held cannot be done. I mean, I'm just looking at a Third Circuit case which involves people protesting a circus. And in that context, you know, when everybody's much calmer, because it doesn't involve abortion, the question of what it is that you can do to make your voices heard without harassing somebody gets decided in a way that is — that suggests that maybe what was going on here was going beyond what we usually, in other contexts, say you really can't do under the First Amendment. And that's my basic problem, that we tend to look at this case, these cases, in terms of what it is that is being protested against, instead of this very difficult question of what is an appropriate First Amendment protest and what is instead harassment. I think an important response to that, Your Honor, is this. The tag-team thing is kind of a strong approach. The basic thing that's going on there is that each individual protester has his own right to address a person, and it's not foreclosed by the fact that somebody else talked to him down the sidewalk.  But when we get to the question of individual things, then I have some problems with what the district court did when it excluded everything of a certain kind, because some were self-contradictory and exaggerating and that. Is that the thing you know? Very much like that. I have to defer, and I'm happy to defer to the district court, but I will only defer to the district court if it didn't, if it took into account everything it should have, and hasn't the district court here, in several instances, excluded consideration of things that it ought to have? No, I don't believe it has. And finally, on the tag-team thing, that's a strong statement, strong way to describe it. The important thing is whether it's one protester or two protesters, that trot down the sidewalk is very short. It is so brief that whether people approach a person, you know, one after another or not, can't make it long. It's about 75 feet, and it's about 10 seconds, and I don't think there's enough time to morph into harassment. Now, as to the court's rejection. Were you representing Jasmine Lalande? No. She's not one of your clients? No. Okay, I'll get the opposing counsel. The questionnaires and the documents, because I share my colleague's concern, those were set aside. They're hearsay, as far as I can tell, but in this context, the district court could have considered hearsay evidence. So why was that a proper determination to set them aside? I think in the context of a preliminary injunction hearing, of course, the court can consider  Where discovery has been done extensively, and there's, I think, 17 live witnesses, the need for the hearsay is attenuated plainly. And very importantly, the recaps were demonstrably unreliable, just as the court found with some of the witnesses. The patient experience questionnaires were hearsay. They were leading. They lacked context. They assumed facts not in evidence, and they were incomplete.  And if a person But, okay, they have chosen to provide some and not others. But does that mean that the court can say, because of that, with no evidence of spoliation, that I will not consider these at all? I mean, that can go to the weight of the evidence and yet the court said that they would exclude all escort recap because some of them were contradicted. Well, why do you exclude all of them because some of them were contradicted? Or why do you exclude all protester questions because some were — because they're not representative? Well, who cares about whether they're representative of others or not? Don't you have to give some value? Now, once the court does, then I defer to it. But shouldn't I insist that the court at least look at and give value to some of the things the other side? I think she did that. That's a very narrow question. I think she did it. And I think part of it — She said she didn't. I mean — She said she didn't consider them at all. She said she wouldn't consider them at all. I think she said she gave them no weight. And that's a decision that's within her discretion. She does it based on her findings that the witnesses that are typically the authors of those lack credibility. And very importantly — Some of them do. But, you know, you have just said what I think is correct, but you cannot gauge everybody who is protesting by the fact that Mr. George, for instance, did block something. And, you know, I'm inclined to agree with you that you cannot just say everybody is — but the other side applies, too. You cannot ignore all the escort comments, because some of them are self-contradictory. You can't ignore the fact that the ones that were presented, because there may be others which said different things that were not. It just seems to me that both sides are arguing to us that you should — because there are some things that are wrong, that you ignore all the rest. And that just — The Court was responding to the fact that the recaps and the patient questionnaires were very biased in the way they were framed up. And very importantly, I think she was responding to the fact that we had the video. When the video is the elephant in the room, it kind of takes over the case, as it should in most cases. It may mean that ultimately you decide things in a way, but it cannot justify saying, I will not look at or will give no weight to individual testimony that is not itself self-contradictory, because other people who are on the same side were self-contradictory, or because there may be other testimony that would come out the same way. It may be that in the end, the Court should say, can say, I read the video and the video convinces me over these things that are here to come out your way. But I don't see how — and again, let's abstract from this situation of what we would do in a case — and we have cases. Jimenez, I believe, is a case on the Fourth Circuit, which was not an abortion case, about what you take into account when some parts of a testimony, some people's testimony ain't any good, whether you can ignore the rest. I think that — You see what I'm saying? I see what you're saying. But the Court was very considerate of these things, and I think she was responding, A, to the fact that we had a ton of evidence and live witnesses, so the hearsay problem is big. I have never been a district judge. I don't dare be a district judge. I know a district judge's position is extraordinarily difficult. I'm not in any way blaming this wonderful district judge. I'm in a different position of saying, in the circumstances of that, is there something that is erroneous? I think not. It's all I do. I don't — What would be the standard we review this by? Abuse of discretion. The thing is, the judge was really responding to the basic quality of those documents, and that is an important part here. That's what she, as a trial judge, is doing. And I think it was within her discretion, especially since we have the witnesses and we have the video. Now, I believe I'm — Just on the escort recaps, did some of them involve some of the escorts who testified? Oh, yes. I believe most of them involved probably only the escorts that testified. I could be wrong about that, but — Okay, so the live witnesses appeared in — Yes. Anything important in a recap was probably associated with a live witness. I believe I'm long out of time. Thank you. Thank you. We'll hear from co-counsel. Good morning, ladies and gentlemen. My name is Brandon Bowling. I'm — Now, you're very tall, and the mic is very low, so — Thank you. Yes, Your Honor. We have this magic table that moves out. That's very impressive. I am here on behalf of Ms. Braxton and Ms. Lalande, who you referenced earlier. Yes. I'd like to ask you a question about — I think it's Exhibit 23? Yes, Your Honor. With Ms. Lalande in the pink jacket? Yes, Your Honor. She walks right up to the door. These people don't want to hear from her, and she follows them right to the door. Why isn't that a violation, per se, of the 15-foot rule? I would have to go back and review the specific video that you are referencing, Your Honor. I don't recall that. But if you're saying it happened, I'm sure it did, so I will go back and look at that. But I'm not familiar with Ms. Lalande doing that in that video. Well, if it's not Exhibit 23, it's another exhibit that I rewatched this morning, where she — she's wearing a pink jacket, and she goes right up to the door, trying to either hand literature — I don't think she had a sign. She was just trying to hand literature to one of the patrons of Choices. If that's what happened, Your Honor, then I guess that's what happened. I don't have the video called up in my mind to be able to tell you that did or that did not. Fair enough. I can't answer that question for you. Fair enough. There was a lot of evidence. I think that I might have an advantage here that also causes me a disadvantage, which you just saw, which is I came to this case a little bit later. So I was not present during the preliminary injunction hearing. So I am not necessarily, from a passion level, involved in this case as much as some of the other counsel may be, because I did not live through the preliminary injunction hearing. When I analyzed — which isn't — you know, yes, we will all die someday statements, which are certainly okay, as against statements about bullets on a sidewalk, a knife on you, or the escort will be gone when you come back. That is, these statements sound to me more like threats than just statements of a sort, be aware that you will — that we all die and have to face our maker, which are certainly okay. And I'm trying to sort out what kinds of statements one can make in a context of this sort that are threatening when we know that people have been shot or knifed and so on in this, as against statements about be aware of your eternal maker. And I don't know if you or the other counsel are the ones that should address that, but the one thing we know cannot be done and protected by the First Amendment in any context is to say something, you know, if you don't do my thing, you may get knifed, something which suggests that. That you can't do. You can say you'll go to hell. And you may be right, but that's a different statement. Yes, Your Honor, I understand your point. And I was not present when those statements were made. I'm sorry. I can't — You know, I just don't know which one of you is — Well, I'm not sure anybody could who wasn't there. And that really gets back to the basis of what this hearing is about. For me to say what they meant would be speculation. What we have here is a one-off — No, I'm not so interested in what the person who made the statements meant, but what objectively a statement of that sort would be taken by an individual. Because what we have here is both a subjective, was I frightened, and that I think there's enough evidence of, but that's not enough. It has to be something that is objectively frightening to someone. And that's the question that some of these statements make me worry about. But that's a question which would ultimately be determined by a jury. We're here because the Court assessed these statements and made a finding of fact at a 14-day-long hearing after reviewing 17 witness live testimonial events, I think 230 exhibits. That included 80 videos off the top of my head. And after analyzing and reviewing all of that, she did not find that the attorney general had met their burden in order to have a preliminary injunction issue. What I have seen through all the briefing and what I heard this morning from the AG is they are in here attempting to relitigate the hearing that took place down in the district court. Seeking appeal of the decision. Yes, they are seeking to relitigate it. Of course. That's what an appeal does. The relitigation of that involves, in that context, clearly erroneous findings of fact. They have to establish that the findings of fact made by the judge after reviewing all the evidence were clearly erroneous. Or abuse of discretion. That is correct, yes. And basically, you're saying on the injunction, whatever these things were, her finding of fact that there was not significant danger that whatever was violated would be repeated is something which we owe great deference to. Yes, Your Honor. That's exactly right. The attorney general will still get to make their closing argument, just like they did already here this morning in front of the trial court. We can finish your sentence at the very least. When we get back down there. The purpose of this hearing here is to determine whether they have met their burden to issue a preliminary injunction in that the judge abused their discretion based upon findings of fact which were clearly erroneous or improperly assessed evidence. They have not done so, and you should affirm the district court. Thank you, counsel. Counsel, you have three minutes. Thank you, Your Honor. That's a little too high for me. Is this fine? Great. Thank you. I'd like to address some of the evidentiary issues that this Court asked some of my  I'll start with the escort recaps. The escort recaps are collected by escort leaders and compiled by escort leaders, including several of the witnesses who testified. But what they reflect is a collection of experiences and observations by numerous escort volunteers that are reported to the escort leaders following a particular Saturday volunteer session. So as we've mentioned in our briefs, what these escort recaps reflect are years, literally years, of discrete observations and experiences that numerous different people have had. And the district court identified only a single discrepancy in a part of one recap and used that finding to disregard the entire category of escort recaps, and we agree that that is inappropriate. In some cases, the recaps are proven by the video associated with the very time that the recap describes. Isn't that correct? That is correct, Your Honor. And that brings me to my next point, which is that blanket rulings are disfavored and can be reversed even on an abuse of discretion standard. And one of the reasons is that a blanket ruling such as this one, which eliminates whole categories of evidence, really precludes the district court from determining whether evidence corroborates each other. So with respect to some of these patient questionnaires, which are filled out by the to find those patient questionnaires to be exaggerated or biased whatsoever. How does any of that go to the question of the injunction vote? You know, I think that's a separate thing. This may go to whether there were violations or whether the court's decision of no violations in certain instances can be upheld or has to be reconsidered. But the question of injunction is, how likely is it that these things will be repeated after a court says, you can do this and you can't do that? And on that, what is it that leads you to say that we should reverse the district court's decision in saying this is not something that is in — they've said that they will go along? Why — and that the government — there may be some problems of that, but the government didn't reverse that affidavit at that time. So it's a little hard for us to say that the court was — abused its discretion in deciding this was not that dangerous of a repetition. Well, just to be clear, the district court denied our motion with respect to the overwhelming majority of conduct here because it found that we could not meet our burden to show a likelihood of success on the merits. Yeah, but leave that aside. Leaving that aside, the district court did make specific findings of obstruction and clinic interference with respect to three defendants and found that those defendants were not likely to repeat their misconduct. And I think one of the reasons why that was an incorrect determination is that those defendants are here today saying that the slow walking is permissible, that it is not obstruction. There have been numerous cases from this Court and others that have found that a defendant's insistence that the underlying conduct is lawful is sufficient evidence that they are likely to repeat that conduct in the absence of an injunction. Now, to return just to the patient questionnaires for a moment, I think many of these patient questionnaires in the record actually did corroborate the escort recaps and the escort testimony with respect to the situation that is happening outside of this clinic. I'd like to point the Court to several examples. JA3831, a patient reports, they had me damn near trapped in my cab. Page 3691, they were being aggressive and yelling at me. Page 3672, they surrounded me and were shoving pamphlets in my face. Page 3914, they followed me yelling entire way to the door very close to me. Page 3915, they continued to touch me and my companion. They forced flyers into our hands. Sotomayor By throwing out this whole category of evidence, the opportunity for corroboration is lost. That's your point. Exactly, Your Honor. And I think one of my colleagues mentioned that there was no need to consider this documentary evidence because there was all of this live testimony. But the district court disregarded the live testimony of nearly all of our witnesses, so there was really no opportunity. But the court made a credibility determination with regard to some of the statements of your witnesses and didn't find them credible. Isn't that right? That's not disregarding. That is not disregarding, but I do want to be very clear that the district court specifically declined to find that those – that those witnesses intentionally lied. That's at page 6 of the district court's decision. Now, an intentional lie might in some cases warrant dismissing all of a witness's testimony. But what the district court found here are certain specific discrete instances of a mistaken recollection that might warrant discounting that recollection, but not the entirety of the witness's testimony. Let me just ask, returning again to the – to the recaps and the questionnaires. I mean, the district court said this is not the usual context in which we would – I would consider hearsay evidence because there's been a prolonged period of time here, there's been substantial investigative work on both sides, and I have a lot of live testimony, and I have some difficulties with these questionnaires and these recaps. In the ordinary case, we would say this is abuse of discretion review. The district court judge made a call. So I'm having – so if you could probably help me on two points to address specifically why it was an abuse of discretion, a legal error in this context, and then why this evidence was so necessary given the extensive video evidence in the live testimony in this hearing. Certainly. With respect to your first question, I think this Court's decision in Mullins holds that hearsay evidence is properly considered on a preliminary injunction, and the context of Mullins is especially relevant here because the P.I. hearing in Mullins followed summary judgment, a merits trial, and a remand from this Court. So this notion that this – that the record in Mullins was somehow less developed than the record here, and that was the dispositive factor in Mullins is simply not borne out by the case. This is a preliminary injunction hearing. This Court held in Mullins that hearsay evidence is properly considered so long – so long as it can be considered and is available, and it is here. And with respect to why the evidence was necessary, I do again think the corroborating element is important. The videos are helpful. They obviously do exist, but once the district court disregarded all of the witnesses' testimony, then the documents were – the documents were really the only thing left to corroborate the videos, and it's really the combination of all of these evidentiary holdings that made it impossible for the – or that made it difficult for the district – for the Attorney General to prove its case. Now, to be clear, we do think that based on the video evidence and photographic evidence in the record, we have established a number of our claims, but we think the evidentiary rulings also provide an alternative basis. Roberts. Let's suppose we decide with you that there were some errors. Then the question of a preliminary injunction still remains. We may decide the Court has to reconsider the likelihood of success and the merits, but you still have this statement by the district court, I think these people, and they've sent in affidavits which you have now traversed, will follow the law once it's been determined. Now, they believe that some of the things they have done are lawful, which you say are not lawful. But is there anything that causes us, should send us to have a district court reconsider that question if some things which they think are lawful are being held ultimately to be unlawful? Is there anything that suggests that they will continue to do things which have been held to be unlawful? And if we say no, is there – what's a – what's a huge difference between   I mean, that's a huge harm. Can you then, if they do it again, get an injunction then? I'm just, you know, trying to figure out what – how much, assuming we buy some of your arguments, goes back to the district court and what we can say we follow what they did. Certainly, Your Honor. And again, to be clear, only one defendant submitted an affidavit attesting that they would not engage in one particular type of conduct, and that is slow walking. So the district court never made a finding about likelihood of repetition with respect to any of the other defendants or any of the other categories of misconduct that are at issue here. So we do think it would be appropriate for the district court to decide those issues in the first instance. And we're not asking this Court to issue an injunction. What we are asking for is for the district court to have an opportunity to evaluate all of the evidence that is appropriate to apply the correct legal standards to that evidence. And with respect to – I understand that this evidence is outside the record, but this conduct is still continuing, and this conduct is continuing, and defendants are using the district court's decision, finding that this conduct is lawful, to justify the misconduct.  And so we're asking for the district court to have an opportunity to make a final  the underlying laws, and whether or not it's a violation of the district court's conclusion that this conduct is lawful or does not violate the underlying laws, is that the conduct will be repeated. Thank you very much. Thank you, counsel. Thank you all. We'll reserve decision. Will and faultfully argued by both sides. Thank you.